IN THE UNITED STATES DISTRICT COURT
                     FOR THE SOUTHERN DISTRICT OF IOWA


- - - - - - - - - - - - - X
UNITED STATES OF AMERICA, :
                          :
      Plaintiff,          :
                          :
vs.                       :        Criminal No. 1:12-cr-27
                          :
JOHNELLE LEWIS BELL,      :        DETENTION HEARING
                          :
      Defendant.          :            Volume II
- - - - - - - - - - - - - X




                          Courtroom, Fourth Floor
                          U.S. Courthouse
                          123 East Walnut Street
                          Des Moines, Iowa
                          Monday, May 21, 2012
                          2:55 p.m.



BEFORE:  THE HONORABLE CELESTE F. BREMER, Magistrate Judge.



APPEARANCES:

For the Plaintiff:      STEPHEN PATRICK O'MEARA, ESQ.
  (By Teleconference)   Assistant U.S. Attorney
                        8 South Sixth Street
                        Suite 348
                        Council Bluffs, Iowa  51501


For the Defendant:      B. JOHN BURNS, III, ESQ.
  (By Teleconference)   Assistant Federal Public Defender
                        Capital Square, Suite 340
                        400 Locust Street
                        Des Moines, Iowa  50309



          THERESA KENKEL - CERTIFIED SHORTHAND REPORTER

I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Government | | | | |
| Anna Brewer | 40 | 65 | | |

E X H I B I T S

| GOVERNMENT EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| 1 - Proffer Agreement with Ms. Lawson | 47 | 47 |

1                        P R O C E E D I N G S

2              (In open court.)

3              THE COURT:  We're just dialling in the probation

4    officer who's in Davenport.  Is she going to testify, or--

5              MR. O'MEARA:  I don't believe so, Your Honor.  But has

6    the report--I think the Court was looking for--

7              THE COURT:  No, I've got it.  I assume each attorney

8    has seen this also?

9              PROBATION OFFICER NEUMANN:  This is Andrea.

10             THE COURT:  Hi.  This is Judge Bremer.  We're just

11   going to start the United States versus Johnelle Bell, 1:12-27.

12   I just was asking Mr. O'Meara and Mr. Burns if they had a copy

13   of your supplemental report that's dated May 21st.

14             And, so, Mr. O'Meara, do you have a copy?

15             MR. O'MEARA:  I don't believe I have that one, Your

16   Honor.

17             THE COURT:  And, Mr. Burns?

18             MR. BURNS:  No, I don't, Your Honor.

19             THE COURT:  All right.  Just give me a minute and

20   we'll--Andrea?

21             PROBATION OFFICER NEUMANN:  Yes.  I'm sorry.  You're

22   cutting in and out.  Send them a copy of the report?

23             THE COURT:  Can you send it both to O'Meara and Burns

24   by e-mail right now?

25             MR. O'MEARA:  If she would send it to the U.S.

1  Attorney's Office to Patty, Patty can bring it in for both of

2  us, Your Honor.

3          THE COURT:  All right.  Steve, what's your fax number?

4          PROBATION OFFICER NEUMANN:  Hello?  Did I lose you?

5          THE COURT:  No.  Andrea--all right.  Sorry.  What's

6  your fax number, Steve?

7          MR. O'MEARA:  The fax number at the U.S. Attorney's

8  Office is 712-328-4048.

9          THE COURT:  We'll just fax it over right now.

10          Andrea?

11          Just disconnect.  She's not hearing us.

12          PROBATION OFFICER NEUMANN:  Hello?

13          THE COURT:  All right.  The clerk is going to go fax

14  that to the U.S. Attorney's Office.  I'll give you a couple

15  minutes to look at it.  In summary, it says probation still

16  recommends detention.  They did check three different halfway

17  houses.  They would accept Mr. Bell under certain conditions.  I

18  think they were CH in Council Bluffs, Fort Des Moines, and one

19  in Pennsylvania, okay, if that helps start your thinking or your

20  train of thought.  But you want to wait until you get a chance

21  to read that before we start the hearing?

22          MR. BURNS:  Well, I can give you a ranking right now,

23  from my perspective, Your Honor.

24          THE COURT:  Well, I have to wait for the clerk to come

25  back to get back on FDR Gold.  We do have a court reporter, but

1    let's just wait a second until she comes back in, okay?  All

2    right.

3              MR. O'MEARA:  If we're going to do that, Your Honor,

4    may I be excused for just a minute to alert my office to bring

5    those copies in?

6              THE COURT:  Why don't you go stand by the fax machine

7    so you can bring the copies in.

8              MR. O'MEARA:  I can do that, Judge.

9              THE COURT:  And then we'll know that they're here,

10   okay?

11             MR. O'MEARA:  Thank you.  I'd be pleased to.

12             THE COURT:  We'll just take a few minutes.  Thank you.

13             (Short recess.)

14             THE COURT:  All right.  So everyone has a copy of the

15   supplemental pretrial service report now; is that correct?

16             MR. BURNS:  Yes, Your Honor.

17             MR. O'MEARA:  Yes, Your Honor.

18             THE COURT:  Okay.  So in addition to this information,

19   does the Government have any other information on the issue of

20   detention?

21             MR. O'MEARA:  Yes, Your Honor.  The Government

22   requests to recall Special Agent Anna Brewer.

23             THE COURT:  All right.

24             MR. O'MEARA:  We do not have--

25             THE COURT:  You want to raise your right hand?

40

1          ANNA BREWER, GOVERNMENT'S WITNESS, SWORN

2          THE COURT:  All right.  Is it going to be easier for

3  you to sit on the other side of the table so you can be--totally

4  opposite of where you are right now so you can face the camera?

5          THE WITNESS:  I'll do whatever you tell me.

6          THE COURT:  Your back's to Mr. Burns then, but--or,

7  Mr. O'Meara, you sit on the other side of the table and let the

8  witness sit on the end.

9          MR. O'MEARA:  Okay.  We can switch places, Your Honor.

10          THE COURT:  Sure.

11          Go ahead.

12                    DIRECT EXAMINATION

13  BY MR. O'MEARA:

14  Q.  Would you please state your name for the record.

15  A.  My name is Anna Brewer.

16  Q.  Your occupation?

17  A.  I'm employed as a special agent with the Federal Bureau of

18  Investigation in Omaha, Nebraska.

19  Q.  How long have you been so employed?

20  A.  I've been a special agent for approximately 17 years.

21  Q.  In the course of your duties do you, in essence, specialize

22  in cases with regard to abducted children, child exploitation,

23  human trafficking, and the like?

24  A.  Yes, sir.

25  Q.  In the course of your occupation have you been engaged in

1  the investigation of various persons, among others, including

2  the defendant, Johnelle Lewis Bell?

3  A.  Yes, I have.

4  Q.  Do you recall having testified in this matter last week?

5  A.  Yes, sir.

6  Q.  Since that time, have you, in part at the request of the

7  prosecutor, caused various leads to be sent for interviews, and

8  information to be gathered in the eastern portion of the United

9  States?

10  A.  Yes, I have.

11  Q.  Among those was there an interview of Shaenna Bell, the

12  stated wife of the defendant?

13  A.  Yes, sir.

14  Q.  Could you relate to the Court the substance of that

15  interview?

16  A.  Law enforcement officers went to meet with her to verify her

17  correct address.  She stated that Mr. Bell was employed by the

18  Coca-Cola Company for approximately two months, and that he was

19  terminated for missing work after ten days.  She stated that she

20  will be moving because she's going to be unable to pay the bills

21  at the residence at which she was staying.

22  Q.  Did she also indicate that she was not currently employed?

23  A.  That is correct.

24  Q.  And that she was receiving unemployment but it was just

25  about--but she had just about depleted her savings?

1  A.  Yes, she did.

2  Q.  Did she also indicate that it was necessary for them--that

3  is, she and their minor child--to move from the residence at

4  which they had been located?

5  A.  Yes.

6  Q.  Is that because they were paying a current monthly rent of

7  $1,050 per month?

8  A.  Yes, and the utilities were not included.

9  Q.  Did you also cause Dayle Bell to be interviewed?

10 A.  Yes, I did.

11 Q.  Who is Dayle Bell?

12 A.  Dayle Bell is the biological mother of Johnelle Bell.

13 Q.  Would you relate to the Court the substance of that

14 interview, please?

15 A.  She stated that he had been employed by the Coca-Cola

16 Company for approximately two weeks.  She stated that the

17 domestic disputes with Johnelle took place a very long time ago

18 when he was a kid, and she stated that she had no knowledge that

19 Mr. Bell had travelled to any other states, but he may have

20 traveled between New York and New Jersey.

21 Q.  Did she state that the purpose of the travel between New

22 York and New Jersey that Johnelle Bell may have undertaken was

23 for the purpose of visiting Mr. Bell's father?

24 A.  Yes, sir.

25 Q.  Did she also indicate that she had knowledge that at some

1    time during the past year that Mr. Bell and Shaenna Bell began

2    living together?

3    A.  Yes, sir.

4    Q.  And to quote her, settled down?

5    A.  Yes, sir.

6    Q.  But she did not know when that actually occurred?

7    A.  Yes.

8    Q.  Did you also cause--but, again, to emphasize, Dayle Bell

9    indicated that she had no knowledge of Mr. Bell, the defendant,

10   traveling throughout the United States?

11   A.  That is correct.

12   Q.  Did you also cause leads to be sent for the interview of

13   Essance Bell?

14   A.  Yes, I did.

15   Q.  Who is Essance Bell?

16   A.  Essance Bell is Mr. Bell's sister.

17   Q.  Can you relate to the Court the substance of that interview,

18   please?

19   A.  Essance Bell also stated that she believed Mr. Bell was

20   employed with the Coca-Cola Company for approximately two weeks

21   prior to his arrest.  She believed he traveled throughout New

22   Jersey for work.  She stated she was unaware of his whereabouts

23   for the last couple of years, but that--and she did not know

24   where he was staying prior to moving with his wife and daughter

25   in Hammonton, New Jersey; she was unable to recall the month

1  that he moved to Hammonton.  She stated that she had no

2  knowledge of him travelling to any other state.

3  Q.  Again, Essance Bell stated that she had no knowledge of

4  Mr. Bell travelling to any state outside the State of New

5  Jersey?

6  A.  That's correct.

7  Q.  Did you have occasion, based on other information, to run a

8  criminal history with regard to Essance Bell?

9  A.  Yes, I did.

10 Q.  Would you relate to the Court significant portions of that

11 criminal history?

12          MR. BURNS:  Objection.  Relevance, Your Honor.

13          THE COURT:  That's overruled.

14 A.  Essance Bell was arrested on three occasions for

15 prostitution, the most recent I believe being in 2009 in New

16 Jersey and in Pennsylvania.

17 BY MR. O'MEARA:

18 Q.  Did you also request that to the extent it could be done,

19 that information be obtained relative to Johnelle Bell's

20 legitimate income report, and also his employment at the

21 Coca-Cola plant?

22 A.  Yes, sir.

23 Q.  With regard to the legitimate earnings in the State of New

24 Jersey, did your office in Newark provide information relative

25 to Mr. Bell's reported income?

1  A.   Mr. Bell has not had any reported income since 2004.

2  Q.   Did you also have a contact made with the Coca-Cola plant?

3  A.   Yes, sir.

4  Q.   Were you able to verify when in fact it was that Mr. Bell

5  began working at the Coca-Cola plant?

6  A.   Yes, sir.

7  Q.   When was that, please?

8  A.   Mr. Bell began the very beginning of April of 2012.

9  Q.   Would that have been approximately on or about April 3?

10 A.   Yes, sir.

11 Q.   And he was terminated after his arrest?

12 A.   Yes, sir.

13 Q.   Did the Coca-Cola plant indicate whether or not Mr. Bell

14 would have a job?

15 A.   He would not be rehired.

16 Q.   Did you also have occasion to conduct interviews of some of

17 the people named in the indictment?

18 A.   Yes, sir.

19 Q.   Was one of those interviewed a relatively brief interview

20 with codefendant Brittany Lawson?

21 A.   Yes, sir.

22 Q.   Was that done pursuant to a formal proffer agreement entered

23 into between the United States Attorney's Office and Ms. Lawson

24 with the assistance of her current attorney?

25 A.   Yes, sir.

1   Q.  This would be the attorney that was appointed to represent

2   her relative to the initial appearance in the State of Arkansas?

3   A.  That's correct.

4   Q.  I believe it's actually the Western District of Arkansas?

5   A.  Yes, sir.

6   Q.  If I hand you Exhibit No. 1, are you familiar with that

7   document?

8   A.  Yes, I am.

9   Q.  And what is that, please?

10  A.  This is the use agreement, the agreement between the United

11  States Government and Ms. Lawson, that her attorney signed, she

12  signed, and I believe you signed.

13  Q.  During the course of the interview in which you participated

14  this morning, did Mr. Morrissey, the attorney for Ms. Lawson,

15  confirm that they were signing that document, and that it would

16  be faxed--I'm sorry--scanned and e-mailed to the United States

17  Attorney's Office?

18  A.  Yes.

19  Q.  That was done early this morning?

20  A.  Yes, sir.

21          MR. O'MEARA:  Your Honor, the Government would offer

22  Exhibit No. 1.

23          MR. BURNS:  No objection, Your Honor.

24          THE COURT:  1 is admitted.

25

1           (Government's Exhibit 1 was offered

2           and received in evidence.)

3           MR. O'MEARA:  I believe, Your Honor, a copy has been

4    provided to your chambers.

5           THE COURT:  Right.  I have a copy.

6    BY MR. O'MEARA:

7    Q.  In the course of the interview, did Ms. Lawson, the

8    codefendant in this case, indicate that she had had contact with

9    the defendant, Johnelle Bell, since June 18, 2011?

10   A.  Yes, she did.

11   Q.  Would you advise the Court what Ms. Lawson said that contact

12   consisted of?

13   A.  Ms. Lawson stated that Mr. Bell attempted to contact her

14   over 20 times after the June 18th incident in Omaha, Nebraska;

15   that two to three of these times was in person, that one of

16   these times was on Facebook, and the rest of these times were

17   telephonic.

18   Q.  Did Ms. Lawson indicate in particular that she had seen

19   Johnelle Bell with other people she knew to be associated with

20   prostitution?

21   A.  Yes, she did.

22   Q.  Would you describe what Ms. Lawson said relative to that?

23   A.  She stated that she was in Little Rock, Arkansas, and that

24   she observed Mr. Bell with Plush, one of his pimp cousins, and

25   Plush's girl, his prostitute that works for him, India, and that

1  Mr. Bell was in a car and he got out of the car and put his

2  hands up and basically wanted her back.  She stated that he was

3  never going to stop looking for her because the girls belonged

4  to him and that he will forever own her because she was his

5  property.

6  Q.  Did Ms. Lawson indicate when this particular contact

7  occurred?

8  A.  I believe it was a month after the June 18th, 2011, incident

9  in Omaha, Nebraska.

10  Q.  Did Ms. Lawson indicate that the 20-some-odd other contacts

11  from Mr. Bell were subsequent to that particular contact?

12  A.  Yes, she did.

13  Q.  So the 20-some other contacts would have occurred sometime

14  after July of 2011?

15  A.  To the best of her recollection, yes.

16  Q.  Plush and the individual referred to as India are both

17  referred either by that acronym--I'm sorry--that pseudonym, or

18  by an initial in the pending indictment; is that correct?

19  A.  Yes, sir.

20  Q.  When Ms. Lawson said that Mr. Bell wanted her back, did she

21  specify what that meant?

22  A.  He wanted her back to work for him as his prostitute.

23  Q.  Did Ms. Lawson indicate whether or not Mr. Bell made any

24  comment about whether or not he wanted some of the other women

25  back?

1   A.   I don't recall, but in interviews with the other girls, they

2   feared that he would come and get them, to get them to come back

3   to him.

4   Q.   Did Ms. Lawson also recognize the name of Shaenna Bell?

5   A.   Yes, she did.

6   Q.   The wife of Johnelle Bell?

7   A.   Yes, sir.

8   Q.   What did Ms. Lawson report with regard to Shaenna Bell?

9   A.   She told me that on one occasion Shaenna reached out to her

10  on Facebook, and Shaenna told Ms. Lawson over the Facebook

11  account words to the effect that, "He'll never love you."

12  Shaenna recognized and acknowledged Ms. Lawson as a ho, that she

13  was just a ho working for Mr. Bell.

14        It was clear to Ms. Lawson that Shaenna knew that

15  Ms. Lawson was a prostitute working for Mr. Bell.

16  Q.   The term "ho" refers to what?

17  A.   A prostitute.

18  Q.   Did Ms. Lawson indicate that she was also present for parts

19  of phone calls between Johnelle Bell and Shaenna Bell?

20  A.   Yes, sir.

21  Q.   What, if anything, did Ms. Lawson say that Shaenna Bell knew

22  about what Johnelle Bell was doing in various states around the

23  United States roughly in the time period of January of 2011 to

24  June 18, 2011?

25  A.   I believe Ms. Lawson overheard Mr. Bell tell Shaenna Bell

1  that they were in Des Moines, Iowa, and that they were in

2  another state.  And Ms. Lawson also heard Mr. Bell allegedly

3  talking to his juvenile daughter saying "Daddy's working."

4  Ms. Lawson also heard Mr. Bell tell Shaenna Bell that he was,

5  quote, going around the world and had pimp cousins.

6  Q.  Did Ms. Lawson also know Essance Bell, the sister of

7  Johnelle Bell?

8  A.  Yes, she did.

9  Q.  In fact, had she met Essance Bell?

10 A.  She had.

11 Q.  What circumstances did Brittany Lawson describe with regard

12 to meeting Essance Bell?

13 A.  They met at the PGA tour last year in Augusta, Georgia, when

14 Essance traveled down to Georgia to meet Mr. Bell and

15 Ms. Lawson.  Ms. Lawson was to train to be a prostitute with

16 Essance, and that the plans were after the Omaha trip, that they

17 were going to Atlantic City so Essance could teach Ms. Lawson

18 how to be a club or a casino prostitute because they believed

19 that club or casino prostitutes could make more money.

20 Q.  During the event in Augusta, Georgia, what did Ms. Lawson

21 say that Ms. Lawson and Essance Bell were supposed to be doing?

22 A.  They were supposed to go to a hotel downtown and then to a

23 club, and it was Ms. Lawson's responsibility to engage in

24 commercial sex acts, act as a prostitute, and bring money back

25 to Mr. Bell.

1  Q.  Did Ms. Lawson also indicate that Johnelle Bell and Essance

2  Bell had telephone conversations, parts of which Ms. Lawson

3  overheard?

4  A.  Yes.

5  Q.  Did Brittany Lawson give any indication as to the extent of

6  knowledge that Essance Bell had regarding Johnelle Bell's

7  prostitution activities throughout an approximately 12-state

8  area?

9  A.  Yes.

10 Q.  What did Brittany Lawson say?

11 A.  Well, aside from traveling to Atlantic City, Essance knew

12 about the prostitution activity that they were involved in.

13 Essance received money from Brittany from the--from Mr. Bell--

14 I'm sorry--from the sex acts that Ms. Lawson had engaged in.  So

15 Ms. Lawson engaged in sex acts, commercial sex acts, turned the

16 money over to Mr. Bell, and Mr. Bell then in turn turned it over

17 to Essance.

18 Q.  That's for her to spend while in Augusta, Georgia?

19 A.  Yes, sir.

20 Q.  Did Brittany Lawson also indicate that Mr. Bell had made

21 comments about Mr. Bell's mother and father relative to the

22 prostitution business?

23 A.  Yes, sir.

24 Q.  What did Brittany Lawson advise you?

25 A.  Brittany Lawson advised me that Mr. Bell's mother had been a

1  prostitute, and his father had been a pimp.

2  Q.  Did Brittany Lawson indicate she knew Dayle Bell?

3  A.  Yes, she did.

4  Q.  How did she know Dayle Bell?

5  A.  She stated she had numerous telephone conversations with

6  Ms. Dayle Bell.

7  Q.  Did Brittany Lawson indicate what, if any, knowledge Dayle

8  Bell had of Johnelle Bell's pimping operation?

9  A.  Yes.

10 Q.  What did Ms. Lawson indicate?

11 A.  Ms. Lawson indicated that, for example, on some occasions

12 Dayle Bell gave Johnelle advice regarding the prostitution and

13 pimping.  Dayle Bell told Johnelle Bell to pray to the PG.  The

14 PG was the pimp god, and the PG would bless them, the PG would

15 protect them.  And then Brittany--Ms. Lawson was subsequently

16 encouraged to pray to the PG because the PG protected pimps and

17 hos.

18         Ms. Lawson was also aware that Mr. Bell sent Dayle

19 Bell money, and Dayle Bell knew that the money came from

20 prostitution because Ms. Lawson had spoken to Dayle Bell on the

21 phone about this funding.  Dayle Bell told Ms. Lawson that

22 Johnelle Bell cares about Ms. Lawson, and Dayle Bell said to

23 Ms. Lawson that she was excited to meet her future

24 daughter-in-law.  And at that time Ms. Lawson told Dayle Bell

25 that she wanted to go home, and Dayle Bell told Ms. Lawson that

1   she was disappointed that Ms. Lawson had left Mr. Bell.

2   Q.  The reference to future daughter-in-law by Johnelle Bell's

3   mother to Brittany Lawson, was that during the time period that

4   Johnelle Bell was married to Shaenna Bell?

5   A.  Yes, sir.

6   Q.  Did Dayle Bell, the mother of Johnelle Bell, have knowledge

7   that Johnelle Bell traveled to various states throughout the

8   United States for purposes of engaging in prostitution?

9   A.  Yes, sir.

10  Q.  And that is all that is related by Brittany Lawson?

11  A.  Yes, sir.

12  Q.  Did Ms. Lawson describe to you some of the personal

13  relationships that existed between Brittany Lawson and Johnelle

14  Bell roughly from the period of January of 2010 to June 18th,

15  2011?

16  A.  Yes, sir.

17  Q.  How does she describe that?

18  A.  Ms. Lawson stated that they had a personal relationship, and

19  that Mr. Bell had promised her that they would get married, that

20  he would take care of her.  He made her a lot of false promises.

21          He also told her that if she ever snitched or provided

22  information to law enforcement, that he would kill her and her

23  family.

24  Q.  Did Brittany Lawson indicate whether or not Johnelle Bell

25  and Ms. Lawson during this same period of time engaged in sex

1  acts?

2  A.  Yes, they did.  Yes, they did, and she said that yes, they

3  did engage in sex acts.

4  Q.  And it was done frequently throughout that time period?

5  A.  Whenever he wanted it, she had to have sex with him.

6  Q.  Again, that was during the period of time that Johnelle Bell

7  was married to Shaenna Bell?

8  A.  Yes, sir.

9  Q.  In particular you indicated that Ms. Lawson said that

10  Johnelle Bell told her that--that is Brittany Lawson--that

11  Ms. Lawson would be his future wife?

12  A.  Yes, sir.  He tattooed her with the name Bam, B-a-m, which

13  is another alias that he uses.

14  Q.  That also is reflected in the indictment?

15  A.  Yes, sir.

16  Q.  What is that intended to show?

17  A.  That shows that she is his property.

18  Q.  You have seen that tattoo?

19  A.  Yes, I have.

20  Q.  Did Brittany Lawson also comment with regard to Sabre?

21  A.  Yes.

22  Q.  Sabre is one of the people reflected in the indictment,

23  particularly reflected as SA?

24  A.  Yes, sir.

25  Q.  Did Brittany Lawson indicate whether or not Sabre was forced

1  to travel from Arkansas to Des Moines, Iowa, for purposes of

2  engaging in commercial sex acts?

3  A.  Ms. Lawson told me that Mr. Bell forced Sabre to travel in

4  interstate commerce to engage in commercial sex acts.

5  Q.  Did Brittany Lawson also comment with regard to Jennifer?

6  A.  Yes, sir.

7  Q.  Jennifer is referred to in the indictment as JO?

8  A.  Yes, sir.

9  Q.  What did Brittany Lawson tell you about whether or not

10  Jennifer's participation in the prostitution venture was

11  voluntary or involuntary?

12  A.  It was involuntary, and that she had never engaged in

13  prostitution prior to meeting Mr. Bell, but she had engaged in

14  prostitution prior to meeting Ms. Lawson.

15  Q.  Was it also true, with regard to Sabre, that Brittany Lawson

16  and Sabre told you that Sabre had not engaged in prostitution

17  prior to meeting Johnelle Bell?

18  A.  Both girls told me that.

19  Q.  Would that be true with regard to Jennifer, that both

20  Jennifer and Brittany Lawson told you that?

21  A.  Yes, sir.

22  Q.  Did Brittany Lawson indicate whether or not at any time

23  during January of 2010 through June 18th of 2011 that Johnelle

24  Bell traveled to New Jersey or Pennsylvania to see his wife,

25  child, or other family members?

1   A.  No, he did not.

2   Q.  I'm sorry.  To specify, you're responding to Brittany Lawson

3   told you that Mr. Bell did not travel to New Jersey or

4   Pennsylvania to see his wife, child, or any other family member

5   during that extended period of time?

6   A.  That's correct.

7   Q.  You have had an opportunity to see a significant number of

8   hard copy prints of internet solicitations for prostitution that

9   have been linked to Johnelle Bell; is that correct?

10  A.  Yes, sir.

11  Q.  Do you know roughly during what period of time these

12  solicitations covered?

13  A.  Well, at least from January 2011 and through June 18th,

14  2011, but there are--there are probably some from 2010.

15  Q.  Is it accurate that most, if not all of the internet

16  solicitations, have as a source identification an e-mail account

17  of gogetemtiger84@yahoo.com?

18  A.  Yes, sir.

19  Q.  Did Ms. Lawson indicate to you whose e-mail account

20  gogetemtiger84@yahoo.com is?

21  A.  She told me on June 18th, at the incident in Omaha,

22  Nebraska, that that e-mail belonged to Johnelle Bell, and she

23  told me the same today.

24  Q.  Did Ms. Lawson today give you any indication whether or not

25  Johnelle Bell carried a firearm during Ms. Lawson's relationship

1  with Mr. Bell?

2  A.  Yes.  She stated that he did carry a firearm.

3  Q.  Did she give a general description of that firearm?

4  A.  Yes.  She stated that it was a black handgun that had a

5  clip.  So it was not a revolver.

6  Q.  Did Ms. Lawson indicate where it was that Mr. Bell carried

7  that handgun on his person?

8  A.  Mr. Bell purchased that weapon from a woman named Sharla,

9  and when he carried that firearm, he kept it in his waistband on

10 his person.  He kept it in the vehicle, hidden in the back of

11 the car, when he was driving.

12 Q.  You had testified to the Court previously that another

13 person had also indicated that they had seen Johnelle Bell with

14 a handgun that would fit that general description?

15 A.  Yes, sir.

16 Q.  I believe in your prior testimony you indicated that it was,

17 quote, one of the prostitutes who said that?

18 A.  Yes, sir.

19 Q.  In fact, who was it that said that?

20 A.  In reviewing my notes after my testimony last week, it was

21 the grandmother of Brittany Lawson, Tina Earles.

22 Q.  You do not show her in the current investigation as a

23 prostitute; is that correct?

24 A.  No.  I incorrectly testified.  I believed that it was one of

25 the girls, when in fact, after reviewing my notes, it was

1   another person that lived in Arkansas, but it was not the

2   prostitute.

3   Q.  When you spoke to Brittany Lawson, did she indicate to you

4   whether or not Johnelle Bell had made any statements regarding

5   an intention to flee from law enforcement or not to be available

6   to court process relative to this specific matter?

7   A.  Yes, sir.

8   Q.  What was it that Brittany Lawson told you?

9   A.  She stated that he said we, quote--"we" meaning the FBI, law

10  enforcement--quote, would never catch him.  Ms. Lawson believes

11  that he's likely to run and he could run because he has so many

12  places to go and, quote, ya all can't find him, unquote.

13          Mr. Bell made those statements, according to

14  Ms. Lawson, all the time, and he made these statements in front

15  of his pimp partners.

16  Q.  You previously testified that, in fact, as reflected in the

17  indictment, that information in the case has indicated that

18  various other people identified as pimps were associated in some

19  sort of confederation with Mr. Bell in terms of prostitution; is

20  that correct?

21  A.  Yes, sir.

22  Q.  And that appears to have predated the term of the

23  indictment, which begins in November of 2009?

24  A.  Yes, sir.

25  Q.  Did Ms. Lawson this morning confirm that some of those

1   people in fact were pimp partners of Johnelle Bell?

2   A.   Yes, sir.

3   Q.   Did she name some of those people?

4   A.   Yes, sir.

5   Q.   At least by their so-called pimp name?

6   A.   Yes, sir.

7   Q.   Who did Ms. Lawson name?

8   A.   She named Plush and I believe Precious--Premiere.  Premiere

9   is also known as Bro, and Premiere aka Bro is the pimp for

10  Shashay Johnson, and Plush is another pimp partner.  Plush is

11  from Minnesota, and Bro, aka Premiere, is from Denver, Colorado.

12  Q.   Again, these people are referred to at least by their

13  prostitution names in the indictment; is that correct?

14  A.   That's correct.

15  Q.   This is also consistent with information received from

16  Jennifer?

17  A.   Yes, sir.

18  Q.   And from other people; is that right?

19  A.   Yes, sir.

20  Q.   When you spoke to Ms. Lawson this morning, did she indicate

21  her reaction to the fact that Johnelle Bell had been arrested?

22  A.   Yes.

23  Q.   What did she advise you?

24  A.   She was elated, crying, hysterical, terrified that he will

25  be released, terrified that he's going to find her.  She claims

1   that she has gone into hiding, and just fears every day he's

2   going to show up and hurt her or her family, as he promised he

3   would.

4   Q.   Did you also today have an occasion to have a conversation

5   with one of Ms. Lawson's female relatives?

6   A.   Yes, I did.

7   Q.   Was that Laura?

8   A.   Laura Foster.

9   Q.   Who is that, please?

10  A.   I believe that's Ms. Lawson's biological grandmother.

11  Q.   Did Ms. Foster indicate to you having received a call that

12  gave her some significant concern?

13  A.   Yes.  Yes, she did.

14  Q.   What was it that Laura Foster related to you?

15  A.   Laura Foster related that when Ms. Lawson was incarcerated,

16  that, quote, some girl called the house looking for Brittany.

17  The girl said that her name was Amanda, and she called from a

18  blocked phone number, and she said she was looking for Brittany.

19  When Ms. Foster asked what it was in regards to, the girl

20  responded it was personal business.  This was unusual, and has

21  made Ms. Foster feel, quote, she is really concerned, unquote.

22  Q.   Was the concern stated in part because Brittany Lawson had

23  made it clear that she had, in essence, gone into hiding, and

24  that her relatives knew she was not generally in contact with

25  other people?

1    A.   That's correct.

2    Q.   Did Ms. Lawson also name for you at least some of the states

3    in which she was involved in prostitution with Johnelle Bell

4    serving as Ms. Lawson's pimp?

5    A.   Yes, sir.

6    Q.   Would you list those for the Court, please?

7    A.   Ms. Lawson stated that she traveled with Mr. Bell to

8    Arkansas, Louisiana, Mississippi, Missouri, Kansas, Colorado,

9    Iowa, Nebraska, South Carolina, Alabama, Georgia, and Texas to

10   engage in commercial sex acts.

11   Q.   And at times that included travel particularly with the

12   other pimp you have identified as Bro?

13   A.   That's correct.

14   Q.   And his prostitute identified as Shashay?

15   A.   Yes, sir.

16   Q.   Did that also at times include travel with Jennifer?

17   A.   Yes, it did.

18   Q.   And at least on one of the last trips through Des Moines,

19   Iowa, did that include Jennifer and Sabre?

20   A.   That's correct.

21   Q.   When you spoke with Sabre, what was her reaction to Mr. Bell

22   being arrested?

23           MR. BURNS:  Objection, Your Honor.  This isn't

24   relevant.

25           THE COURT:  That's overruled.

1   A.  Sabre was terrified.  She was crying on the phone.  She

2   called me in tears.  Her mother was with her.  She says she

3   can't sleep, she has nightmares, she's just terrified.

4   BY MR. O'MEARA:

5   Q.  When you had contact with Jennifer, what was her reaction to

6   Mr. Bell being arrested?

7   A.  When I told Jennifer that Mr. Bell had been arrested, she

8   began to scream.  She then started to cry.  She called her

9   mother over and was yelling at her mother.  Again, she, too, is

10  fearful that Mr. Bell will do something to hurt her or her

11  daughter.

12  Q.  When you spoke with Sabre, did Sabre indicate whether or not

13  she had had any contacts with Johnelle Bell after the June 18th,

14  2011, encounter with Mr. Bell and these women in Omaha,

15  Nebraska?

16  A.  Yes, she did.

17  Q.  What did she report about that contact?

18  A.  Sabre stated that Mr. Bell had tried to contact her on

19  Facebook.

20  Q.  Did she indicate what the nature of the contact was?

21  A.  She believed he wanted her to get back into the game of

22  prostitution.

23  Q.  Other than the people you have listed, that is Brittany

24  Lawson, Jennifer, Sabre, have other people indicated that they

25  are in fear of Johnelle Bell?

1   A.   Yes, sir.

2   Q.   Is this fear predicated in part upon each of them

3   independently stating that Mr. Bell has threatened them that if

4   they ever attempted to snitch on him or testify against him,

5   that he would get both them and their families?

6   A.   That, coupled with observation of his behavior.

7   Q.   When you say that, you mean violent behavior toward some of

8   these women?

9   A.   Yes.

10  Q.   Violent behavior which you described last time to the Court?

11  A.   Yes, or is listed in the indictment.

12  Q.   From the investigation you were able to determine by various

13  means that there were a significant number of telephone numbers

14  that were used to carry out the solicitation for and commercial

15  sex acts; is that right?

16  A.   Yes, sir.

17  Q.   And you compiled a working list of those numbers?

18  A.   I did.

19  Q.   At least some of them?

20  A.   Yes, sir.

21  Q.   And you were asked to determine where the various area codes

22  for those numbers came from; is that right?

23  A.   Yes, sir.

24  Q.   Can you advise the Court?

25  A.   Some of the phone numbers that I identified through the

1  internet solicitations include the 318 area code, which is

2  Louisiana; 843 area code, which is South Carolina; 214 area

3  code, which is Texas; 501 area code, which is Arkansas; 479 area

4  code, which is Arkansas; 412 area code, which is Pennsylvania;

5  804 area code, which is Virginia; and 205 area code, which is

6  Alabama.

7  Q.  Those particular phone numbers were either linked to

8  Mr. Bell or to one of the women you have described on the

9  record?

10 A.  Yes, sir.

11 Q.  And, again, generally those would be consistent with the

12 indictment in terms of what is described, for purposes of this

13 indictment, as the initiation of the indictment by Johnelle Bell

14 recruiting Jennifer; is that right?

15 A.  Yes, sir.

16 Q.  And then stretching throughout many of the states that are

17 referenced in the indictment, or were referenced by Brittany

18 Lawson, in which Johnelle Bell, serving as pimp, had females

19 engaged in prostitution?

20 A.  Yes, sir.

21       MR. O'MEARA:  I have no other questions at this time,

22 Your Honor.

23       THE COURT:  Do you have cross?

24       MR. BURNS:  Yes, I do, Your Honor.

25

BREWER - CROSS

1                        CROSS-EXAMINATION

2     BY MR. BURNS:

3     Q.   Agent Brewer, what crime has Johnelle committed after June

4     18, 2011?

5     A.   None that I know of.

6     Q.   In addition to the extensive investigation that you did

7     prior to the hearing we had ten days ago, you've done an

8     extensive investigation in the last ten days?

9     A.   Done a lot of work in the last couple days.

10    Q.   You re-interviewed a lot of the people involved in this

11    case?

12    A.   Yes, sir.

13    Q.   Managed to get a proffer agreement out of the codefendant,

14    Brittany Lawson?

15    A.   That's correct.

16    Q.   Did an extensive interview with her this morning?

17    A.   About an hour.

18    Q.   Contacted the defendant's family and everybody associated

19    with him?

20    A.   I think we contacted three people and his employer.

21    Q.   And like as it was at the hearing ten days ago, there's no

22    indication that Johnelle Bell committed any crime after June

23    18th, 2011; correct?

24    A.   Other than possible intimidation.  There's nothing he's been

25    convicted of.

1  Q.  Intimidation was he ran into Brittany Lawson in Arkansas

2  sometime shortly after the incident--after June 18th; correct?

3  A.  Yes, sir.

4  Q.  And said "I want you back"?

5  A.  Yes, sir.

6  Q.  Essentially, as Brittany Lawson and everybody else in this

7  case alleges, she and Johnelle Bell had a romantic relationship?

8  A.  That's correct.

9  Q.  That's kind of the nature of the beast, at least from your

10  perspective in dealing with this kind of behavior?

11  A.  It's consistent, yes.

12  Q.  At least she would indicate that she bought into that

13  romantic relationship?

14  A.  She believed his promises.

15  Q.  She had strong feelings for Mr. Bell?

16  A.  Yes, she did.

17  Q.  Essentially he encountered her in Arkansas and said "I want

18  you back"?

19  A.  Yes.

20  Q.  Which according to you, you interpreted that as an

21  indication that he wanted her to engage in commercial sex acts?

22  A.  I specifically asked Ms. Lawson what she believed that to

23  be.  She told me she believed he wanted her to engage in

24  commercial sex acts.

25  Q.  This is Brittany Lawson who gave you most of the information

1 that you provided in your testimony today?

2 A.  On what she told me, yes.

3 Q.  That was information she gave you this morning?

4 A.  Yes, sir.

5 Q.  After she signed the proffer agreement?

6 A.  Yes, sir.

7 Q.  And in an attempt to work out a better deal than what she's

8 facing, all these charges, the same charges that Mr. Bell is

9 charged with?

10 A.  Yes, sir.

11 Q.  All of the alleged incidents involving--was it Jennifer?

12 They all occurred before June 18th, 2011?

13 A.  Yes, sir.

14 Q.  All the incidents involving Sabre occurred prior to June

15 18th, 2011?

16 A.  I believe he contacted Sabre after the June 18th Omaha

17 incident.

18 Q.  But he did not engage in any illegal activity with her?

19 A.  No, sir.

20 Q.  Kind of the same thing, trying to get back in touch?

21 A.  Yes, sir.

22 Q.  Which either they or you interpreted as an indication to

23 engage in a commercial sex act?

24 A.  Yes, sir.

25 Q.  But he didn't really say that; right?

1   A.   I do not believe he said that.

2   Q.   Several times either he or his wife, or whatever, would get

3   on Facebook and communicate with some of these people?

4   A.   Yes, sir.

5   Q.   Which is not illegal; correct?

6   A.   No, it's not.

7   Q.   All the information regarding the defendant's sister,

8   Essance Bell, that behavior occurred prior to June 18th, 2011?

9   A.   That's correct.

10  Q.   And all the information concerning the defendant's mother,

11  Dayle Bell, that all concerns information--activities that

12  occurred prior to June 18th of 2011?

13  A.   That's correct.

14  Q.   And all the allegations that Mr. Bell was seen with a

15  firearm, that all relates to incidents prior to June 18th, 2011?

16  A.   That's correct.

17  Q.   And all of the internet solicitations you talked about

18  today, all of those were posted on the internet prior to June

19  18th, 2011?

20  A.   That's correct.

21  Q.   And all these telephone numbers that we talked about today

22  that were provided by you, they're all telephone numbers that

23  were in existence and used prior to June 18th, 2011?

24  A.   Yes, sir.

25  Q.   The telephone conversations that were allegedly overheard by

1  Brittany Lawson between Mr. Bell and his wife and his children,

2  all of those occurred prior to June 18th, 2011?

3  A.  Yes, sir.

4  Q.  And you were present at the hearing ten days ago when we

5  went through all this the first time; right?

6  A.  Yes, I was.

7  Q.  And you heard the proffer that I gave, the professional

8  statement I gave about information that I had dug up?

9  A.  Yes, sir.

10 Q.  Do you recall me saying that at one point in time Mr. Bell

11 had worked for Coca-Cola, but he could no longer work there?

12 A.  That's correct.

13 Q.  You recall me saying my paralegal had contacted Coca-Cola,

14 and they said he could no longer go back and work at that

15 company?

16 A.  I don't recall that, but I believe it.

17 Q.  So pretty much everything you obtained from the defendant's

18 wife is consistent with what I was saying ten days ago at the

19 first detention hearing?

20 A.  Other than she had--she believed that he worked there for

21 two months, and he did not work there for two months.

22 Q.  He worked there for a period of time?

23 A.  Yes, that's correct.

24        MR. BURNS:  Thank you.  No more questions, Your

25 Honor.

1          MR. O'MEARA:  No redirect, Your Honor.

2          THE COURT:  All right.  Thank you.

3                        (Witness excused.)

4          THE COURT:  All right.  Anything else from the

5   Government?

6          MR. O'MEARA:  No, Your Honor.  Thank you.

7          THE COURT:  All right.  And for defendant?

8          MR. BURNS:  Just argument, Your Honor.

9          THE COURT:  All right.  We'll let the Government argue

10  first since it's their motion.

11         You can go first, Mr. O'Meara.

12         MR. O'MEARA:  Your Honor, the law establishes that

13  both in the statute and in the applicable case law that there

14  are four factors that should be looked at for purposes of

15  detention or release.  The first is the nature and the

16  circumstances of the crime.  In particular, I note here that the

17  defendant is charged with at least three offenses which carry a

18  maximum penalty of life imprisonment, two offenses which carry a

19  minimum mandatory term of imprisonment of ten years, and a

20  number of offenses which carry a maximum term of imprisonment of

21  20 years.

22         In addition, these cases--or these statutes, the 1591

23  and the 1594(c), are specifically referred to as slavery, and

24  also they deal with acts of coercion and force and fraud against

25  the victims.  The Government has identified in the context of

1   the indictment and here today at least three, perhaps four or

2   more, victims, one of whom is alleged to have been under 18

3   years of age at the time that the defendant first recruited her

4   to engage in prostitution, and at the time that she first

5   engaged in prostitution for the defendant.

6        The second factor is the weight of the evidence

7   against the defendant.  Counsel for the defense made somewhat

8   light of this previously.  But the fact of the matter is that

9   the Federal Grand Jury for the Southern District of Iowa has

10   found probable cause, that a very detailed statement of facts,

11   approximately 50 pages in length, exists.  That's the fact.  The

12   Grand Jury has found probable cause for all of the facts set

13   forth in that extremely detailed indictment.

14        The indictment is replete with allegations against

15   Johnelle Bell of physical and psychological or emotional abuse

16   of the victims alleged to be in this case, and the fact is that

17   he involved a person who at least initially was under 18 years

18   of age.

19        The Government has set forth in the two sessions of

20   this hearing significant reference to--some, but significant

21   portions of anticipated testimony from people named in the

22   indictment, including Jennifer, JO, Sabre, SA, and as of this

23   morning some significant detail from codefendant Brittany

24   Lawson, in addition to other persons who were not in any sense

25   victims, or otherwise engaged in the transaction of these

1    crimes, including testimony relative to Mr. Bell's engagement in

2    this prostitution, his use of force, and his carrying a firearm.

3          The Government respectfully submits to the Court that

4    the weight of the evidence against the defendant is very

5    significant.

6          Number three, the history and characteristics of the

7    defendant, including the defendant's mental condition, family

8    ties, employment, community ties, and past conduct.  There is no

9    allegation that there is any significant concern at this time

10   about the defendant's mental condition.

11         With regard to family ties, the defendant mentioned

12   two or three people in particular in the original session of

13   this hearing.  Those people were interviewed.  They consist of

14   the defendant's sister, who has been arrested three times for

15   prostitution, who went to Georgia to engage in prostitution with

16   the defendant and Brittany Lawson, who benefited financially, at

17   least at times, by the prostitution venture, who had clear

18   knowledge that the defendant was traveling throughout the United

19   States engaging in prostitution, and who told investigators that

20   she had no knowledge of the defendant traveling throughout the

21   United States.

22         The defendant's mother, who indicated that she had no

23   knowledge of the defendant being engaged in prostitution, and no

24   knowledge of the defendant traveling throughout the United

25   States particularly for that purpose.  And yet according to

1   Brittany Lawson, she had significant detail, having communicated

2   directly with Brittany Lawson and with the defendant about the

3   prostitution activities, having benefited financially from the

4   prostitution activities with knowledge, and having even gone so

5   far as to asking the defendant and Brittany Lawson to pray to

6   whatever god prostitutes pray to for protection, and chiding

7   Brittany Lawson for her failure to be a better prostitute for

8   Johnelle Bell.

9           And then, also, the defendant's wife who purported to

10  have no knowledge of his travel throughout the United States,

11  and yet clearly, according to Brittany Lawson, had specific

12  knowledge, not only that Johnelle Bell was traveling throughout

13  the United States, but that in fact he was engaging in

14  prostitution.  And that according to Brittany Lawson, Johnelle

15  Bell's wife had a direct e-mail contact with Brittany Lawson.

16          Now, this is supposed to be a settled family tie,

17  according to some of the statements with regard to Johnelle Bell

18  reuniting with his wife.  The record seems to be overwhelming

19  that the defendant, Mr. Bell, promised a series of women that he

20  loved them, that he would be with them, even referring to some

21  of them, in particular Brittany Lawson, on occasions as his

22  future wife, stated that he wanted to have children by them, at

23  least from the time period of November of 2009 to June 18th,

24  2011.  And yet we know that he had contact with Sabre after that

25  period, we know that he had 20-some contacts with Brittany

1   Lawson after that period.

2          So in this period of time that he is supposed to be

3   married, he is actually out engaging in prostitution in at least

4   12 states of the United States, fully known to his wife,

5   engaging in sexual activity with a number of prostitutes, and

6   providing financial benefit to his wife from the prostitution.

7          Employment.  At best it can be said that in the month

8   leading up to the defendant's arrest, or just a little bit less

9   than that, the defendant was engaged in legitimate employment.

10  Other than that, there is no record, no proffer of the defendant

11  having engaged in any legitimate employment since 2004.  And

12  yet, according to the defendant's wife, they have been living in

13  a house, the rent of which was over one thousand dollars a

14  month, utilities not paid, and that not covering any of the

15  other budget of the household.

16         The Government suggests that a reasonable and natural

17  conclusion from those numbers is that the defendant was in fact

18  continuing to live at least in part off of illegal activity,

19  whether it be money obtained from the prior time period, or

20  continuing to engage in illegal activity as represented by the

21  defendant's attempts to solicit three of his former prostitutes

22  back into prostitution.

23         Community ties.  There is no indication that the

24  defendant has strong ties to any community.  The household in

25  which he was living no longer exists.  The job which he had for

1 just over three weeks no longer exists, and he cannot have it

2 back.  There is no indication that--in fact, the only record is

3 that the defendant did not even attempt to visit New Jersey or

4 Pennsylvania from November of 2009 to at least June of 2011.

5         His past conduct.  There are some really telling

6 factors here, and the law seems to make it clear that the past

7 conduct should be weighed heavily.  And please recall that the

8 only indication that we have that the defendant was engaging in

9 any type of rehabilitative behavior came within approximately

10 three months--or three weeks prior to his arrest, on and after

11 April 3 of 2012.  There is no indication of any rehabilitative

12 efforts from June 18th of 2011 to April 3 of 2012.

13         What we do know, however, are the following facts:

14 The defendant was previously convicted of a robbery that grew

15 out of a carjacking for which he was sentenced to five years

16 imprisonment and for which there is a citation for a failure to

17 appear and an arrest during the course of those proceedings.

18         We also know that from sometime prior to November of

19 2009, and continuing to at least June 18, 2011, the defendant

20 engaged in a confederated prostitution activity with at least

21 three other prostitutes--I'm sorry--pimps, and with a number of

22 prostitutes, some whom he supervised, some whom the other pimps

23 supervised.  And that this prostitution operation encompassed at

24 least some 12 states, reaching from the East Coast of the United

25 States to the Rockies in Colorado.

1          We also know that following June 18, 2011, the

2    defendant attempted, according to their statements, to regain

3    Jennifer, Sabre, and several times Brittany back into

4    prostitution.

5          The fourth element is the nature and seriousness of

6    the danger to the community or to an individual.  The

7    uncontroverted record before this Court is that Johnelle Bell

8    has engaged in a confederated interstate prostitution activity

9    which was based on force, fraud, and coercion; that he has a

10   number of so-called pimp cousins with whom he confederated, and,

11   according to Brittany Lawson, apparently continued to

12   confederate after June 18, 2011.  This is a large crime both in

13   the duration of the time it was carried out over, and the

14   geographic scope of the crime.

15         It also appears to be large in the context of the

16   number of people who were actually involved in the crime, and

17   whom--according to Brittany Lawson, the defendant said he could

18   run from law enforcement and never be found because of the

19   extent of this network.

20         There's also a serious danger both to the community

21   and in particular to many of the victims of the defendant,

22   including, specifically, Jennifer, Sabre, and perhaps the

23   codefendant, Brittany Lawson.  The indictment is replete with

24   references to the defendant's threats to kill anyone who

25   snitched on them, and not only to kill them, but to kill their

1    families because the defendant wasn't going back to prison.

2            The indictment and the testimony that is brought

3    before you, it particularly attributed to Sabre, Jennifer, and

4    Brittany Lawson that the defendant made these threats, stated he

5    would run, and that he used coercive activity, physical

6    assaults, particularly against the person of Jennifer, to back

7    this up; and that these women exist currently in abject fear of

8    the defendant because of his serious threats, and because of the

9    physical assaults he perpetrated against Jennifer.

10           At least two people have also indicated that the

11   defendant carried a firearm during at least a portion of the

12   time period during which the defendant was engaged in the sex

13   trafficking activities, the interstate prostitution.

14           Looking at these factors, and considering the

15   presumption to which the Government is entitled in this case, a

16   presumption which the Government argues the defense has not

17   counterbalanced as required by statute, the Government

18   respectfully submits that there is clear and convincing evidence

19   that the defendant should be detained on the basis of

20   dangerousness, and there is certainly a preponderance of the

21   evidence that the defendant should be detained to reasonably

22   assure the defendant's appearance.

23           Now, the Government realizes that the presumption is

24   rebuttable, but the defense must meet a burden of production to

25   rebut that presumption by coming forward with evidence that the

1  defendant does not pose a danger to the community or a flight

2  risk.  That's the Abad case, 350 F.3d 793, Eighth Circuit 2003.

3        The Government respectfully submits to the Court that

4  the defendant has not come anywhere near rebutting that

5  presumption in this case.  So on the presumption alone the

6  Government argues the defendant should be detained both as a

7  danger to the community and of not reasonably likely to appear.

8        Considering these factors, Your Honor, the Government

9  respectfully submits that there is no condition or set of

10  conditions which will satisfy the protection of the community,

11  the protection of some of the former victims of the defendant

12  who now are clearly Government witnesses, and that will

13  reasonably assure the defendant's appearance.  The Government

14  continues to request detention.  Thank you.

15        THE COURT:  All right.  Argument for Defendant?

16        MR. BURNS:  Your Honor, the defendant has met its

17  burden to the very extensive presentation of evidence put on by

18  the Government both today and ten days ago.

19        To start off with, Your Honor, the Grand Jury did not

20  draft this indictment.  The Grand Jury simply signed this very

21  extensive, detailed indictment presented to them by the United

22  States Attorney's office.  We were here ten days ago, Your

23  Honor.  The Government had a chance to prove its case based on

24  the very extensive investigation done by the Federal Bureau of

25  Investigation.  And one point stood out on that date, which is

1  this scheme, if you want to call it, this alleged scheme was

2  broken up on June 18th, 2011.  And the Court, I believe at that

3  point in time, agreed with me on that.  The fact of the matter

4  is that this all ended on June 18th, 2011, and there's not a

5  scintilla of evidence that Mr. Bell has been engaged in any

6  illegal conduct since then.

7          And even after today, even after the Federal Bureau of

8  Investigation has gone out for the last ten days and tried to

9  find more information against Mr. Bell, all of it relates to

10  incidents that occurred prior to June 18th, 2011.  He's not

11  committed any crime since then.  He's back living at home, he

12  had a job for a period of time, he could get work again.

13          The Government talks about Essance Bell and Dayle Bell

14  as people that we brought up at that hearing two weeks ago.  I

15  had to ask at the beginning of this hearing today, I had to ask

16  the defendant who Essance Bell was because I'd never heard that

17  name before, and that's somebody that the prosecutor just

18  brought to the Court's attention so that they can shut her down--

19          THE COURT:  Wait a second.  Wait.  I think she's

20  mentioned in the first pretrial service report.

21          MR. BURNS:  I didn't bring it up.

22          THE COURT:  No, but that name--the fact that he had a

23  sister that lived in New Jersey was included under the family

24  ties section of the first pretrial service report.  It's not

25  somebody who just--

1       MR. BURNS:  Nevertheless, Your Honor, the only point

2   that we made at that hearing ten days ago is that the defendant

3   had a wife and children back there where he was living at, and

4   the Government had no difficulty finding him there at that

5   address.  They came, they arrested him, they brought him back

6   here.  And there's no indication anytime between June 18th,

7   2011, and the day that he was brought in he committed any crimes

8   during that period of time.  And they've got the resources of

9   the Federal Bureau of Investigation to find something, and they

10  found absolutely nothing.

11      The question today wasn't that, it wasn't giving the

12  Government a second bite at the apple, an opportunity to flesh

13  out the allegations made in the indictment.  The question today

14  was disposition, where are we going to send the defendant?  And

15  the probation office has come up with a list of alternatives,

16  and that's the thing we need to be talking about today.

17      THE COURT:  All right.  And so you would like the

18  Court to use one of the halfway houses identified by the

19  probation office?

20      MR. BURNS:  My list of priorities would be, I think,

21  number one, to try to get him as close to his family as you can

22  get him.  So this locked facility, this Kintock House in

23  Philadelphia would be our No. 1 request.  Other than that, I

24  think our second request would be the Curt Forbes facility

25  because there is a bed available, and that will place Mr. Bell

1  at least in physical proximity to me which would allow us to

2  prepare for trial.

3          THE COURT:  All right.  Any response by the

4  Government?

5          MR. O'MEARA:  Your Honor, nowhere anywhere in the case

6  law or the statute does it say that in order to detain the

7  defendant it has to be shown that the defendant engaged in

8  criminal activity after the criminal activity under indictment

9  appears to have ceased.  I listed for the Court the four factors

10  that both the statute and the case law rely upon, and gave what

11  I hoped to the Court was a lengthy laundry list of the reasons

12  under the indictment, the statutory presumption, and the

13  evidence presented by the Government, why each and all of those

14  four factors were met.

15          The Government continues to argue that the defendant

16  simply has not produced evidence sufficient to overcome the

17  presumption, let alone to rebut the specific evidence presented

18  by the Government for the probable cause determinations of the

19  indictment.

20          There is nothing short of detention in this case which

21  will allow the community and the prior victims, now witnesses

22  for the Government that have been identified for this case, to

23  be safe.  If nothing else, placement in a halfway house would

24  facilitate the ability of the defendant to have communication

25  with his confederates, where his placement at the Pottawattamie

1  County Jail would certainly greatly diminish that prospect.

2          So the Government continues to request detention,

3  noting as the Court did at the beginning of this hearing that

4  the probation office continues to recommend detention having

5  specifically considered three possibilities for halfway house

6  placement.

7          The Government also notes that I think there was at

8  least some discussion of the possibility of persons in the

9  defendant's family being responsible for the defendant.  I don't

10  understand that as being really an option that has been

11  discussed today.

12          Again, if you have looked at the background of the

13  people that were mentioned in the presentence report, or

14  suggested by the defendant at the initial session of this

15  hearing, it's clear that those people benefited from the

16  criminal activity here at issue, they knew of the scope of the

17  criminal activity, and they actually encouraged victims in the

18  case to do a better job of being prostitutes for the defendant.

19          There just simply is no set of conditions that would

20  protect these people, or protect the community, or reasonably

21  assure the appearance of the defendant, particularly, again,

22  considering if you look at his past behavior, there was a

23  failure to appear in the robbery case, and there was a clearly-

24  stated intent by the defendant not to appear in this case

25  because he's not going to go back to prison.

1          And certainly the whole analysis has changed now that

2     the defendant is under arrest and understands the very serious

3     nature of the offenses and penalties which he faces, which the

4     case law clearly says is a factor to be weighed by the Court in

5     determining whether or not to detain.

6          So for all those reasons for all the reasons

7     previously stated, for the presumption, for the record

8     previously made, the Government continues to strenuously argue

9     for detention in this particular case.  Thank you.

10          THE COURT:  All right.  Well, based upon the testimony

11     from the May 10th hearing and today, the pretrial service

12     reports, both the one at the original hearing and the

13     supplemental report received today, in considering the factors

14     under 3142, I will detain the defendant.

15          It was my thought after our last hearing that really

16     we were just considering an issue of residency or supervision.

17     I think considering all of the information provided, I can't

18     rely on family ties to be the kind of support I was looking for

19     them to be, and so I do not think that the halfway house as

20     proposed, or at least reviewed by probation at my request, would

21     provide sufficient supervision in terms of concerns about risk

22     of flight and danger to the community.

23          I know that there is this gap, the almost one-year gap

24     between the time when the charged--the activities charged in the

25     indictment cease and today.  I was looking for what we could use

1   to fill in to provide some either community support, social

2   support, employment, and there just aren't any factors there

3   that bolster that.

4          The criminal history is, you know, a conviction of

5   nine years ago, although under the report it was a five-year

6   sentence plus three years parole, and I don't know when parole

7   started or stopped.  So I'm assuming parole was completed, but I

8   can't tell if it overlaps any of the time alleged in this

9   indictment.  So I'm not counting that for more than the one

10  felony conviction that it is.

11         I do note the one failure to appear during that.

12  Again, for somebody who's 27 with one felony and one FTA

13  already, not very good; no employment history that I can rely

14  on; and this whole family dynamics seems pretty unsettled, to

15  me, as does residency, and I don't feel that the support or the

16  restrictions I could provide through a halfway house are going

17  to be sufficient to satisfy me as to both appearance and risk.

18         So I'm going to enter an order of detention.  You

19  obviously have the right to appeal that and would need to do

20  that promptly, and you know how to get on a district judge's

21  calendar in order to get that heard.

22         So I'll get an order entered, and I think we've

23  already done our arraignment and have a trial date on this,

24  right?  So we have a July 9th trial date.  Anything else?

25              MR. O'MEARA:  We do, Your Honor.  I might mention with

1 regard to that, I think it's anticipated that the codefendant

2 will be arraigned in this district in early June.  I think it

3 might be appropriate, depending on counsel that represents the

4 defendant at her appearance in this court, that counsel would

5 talk, and that we have some sort of a pretrial conference where

6 we talk about dates.  So I would ask the Court to at least keep

7 that in mind and perhaps, then, we as counsel could approach the

8 Court after that second arraignment.

9          Does that sound all right to you?

10          MR. BURNS:  That's fine, yes.

11          THE COURT:  All right.  We should have--I believe the

12 June status conference date is June 14th, so we could put it in

13 for those status conferences, if you'd like.  But why don't you

14 wait until we see the other defendant and see where we are in

15 the Speedy Trial Act world, okay?

16          MR. O'MEARA:  Thank you, Your Honor.

17          THE COURT:  All right.  Thank you.

18          (Proceedings concluded at 4:20 p.m.)

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2              I, the undersigned, a Certified Shorthand Reporter of

3    the State of Iowa, do hereby certify that I acted as the

4    official court reporter at the hearing in the above-entitled

5    matter at the time and place indicated;

6              That I took in shorthand all of the proceedings had at

7    the said time and place and that said shorthand notes were

8    reduced to typewriting under my direction and supervision, and

9    that the foregoing typewritten pages are a full and complete

10   transcript of the shorthand notes so taken.

11             Dated at Des Moines, Iowa, this 1st day of June, 2012.

12

13

14              /s/ Theresa Kenkel
                CERTIFIED SHORTHAND REPORTER
15

16

17

18

19

20

21

22

23

24

25